**TRANSPACIFIC CARRIERS CORPORATION, as owner of the M/V HELLENIC SPIRIT, Libelant-Appellee,**

v.

**The TUG ELLEN F. McALLISTER, her engines, etc., and McAllister Brothers, Inc., Claimant-Respondent-Appellant.**

**No. 420, Docket 28254.**

United States Court of Appeals Second Circuit.

Argued April 30, 1964.

Decided Aug. 7, 1964.

W. Shelby Coates, Jr., New York City (Dow & Stonebridge, New York City, on the brief), for libelant-appellee.

Christopher E. Heckman, New York City (Stephen J. Buckley, New York City, of counsel; Foley & Martin, New York City, on the brief), for claimant-respondent-appellant.

Before LUMBARD, Chief Judge, and MOORE and SMITH, Circuit Judges.

MOORE, Circuit Judge.

This is an appeal from an interlocutory decree in admiralty, 209 F.Supp. 870 (S.D.N.Y.1962), granting appellee, Transpacific Carriers Corp., the owner of the M/V Hellenic Spirit, recovery *in rem* from one appellant, the tug Ellen F. McAllister, and *in personam* from the other appellant, McAllister Brothers, Inc., the owner of the tug and general employer of the tug captain and docking pilot for damages received in a docking collision.

On December 3, 1958, the Hellenic Spirit was proceeding under her own power in New York City harbor en route to her berth at Pier 44 in Brooklyn, New York. The ship was heavily loaded. Pursuant to arrangements made by appellee's port captain, the tug Ellen F. McAllister was assigned to assist in the docking of the ship. The tug captain who acted as docking pilot boarded the Hellenic Spirit at the entrance to Buttermilk Channel and began to direct the movements of the ship to Pier 44. The tug was of the 1,000 horsepower class commonly used for assisting ships. The docking pilot had been a pilot for the preceding thirty years, holding a full port pilot's license to New York City harbor since 1923. The pilot was well familiar with the tug, having been its captain for the preceding two years. The pilot was also familiar with Pier 44, having docked other ships there, including ships similar to the Hellenic Spirit.

The ship was to be docked port side to the south side of the pier, the pier extending in a westerly direction. The docking commenced sometime during the last half hour of flood tide or some thirty minutes before slack water. This interval would have probably lasted from two to seven minutes. The port captain had requested McAllister's dispatcher to ask the Sandy Hook pilot, an independent pilot not associated with McAllister, to have the ship off the pier in slack water. The docking pilot planned to dock the ship by placing her directly into the clear space between Pier 44 and the adjoining pier. The ship was to remain under its own power and under assistance of the pilot and tug until docked. The pilot began his planned maneuver, but soon realized that the current was stronger than he had originally calculated, running

at half to three-quarters of a knot. See-
ing he was unable to hold the ship, he
discontinued his plan and backed out
cleanly. Having pulled clear of the pier ·
without making contact with it, he de-
·cided to put the ship against the south
·corner of the off-shore end of the pier and
pivot her into the berth. However, the
·current prevented proper execution of
this second plan and the ship was set
.against a pile on the north corner of the
pier at about 1:20 P.M. The impact
·damaged one of the ship's plates in its
hull forward of the bridge.

Upon the facts the trial court concluded
that the pilot was negligent in that he
"failed to properly assess the strength of
the * * * [current] vis-a-vis the
power of the tug," or that he was "negli-
gent for failing to properly assess the
·capacity of the tug in the then-existing
.state of the * * * [current]," and
that the tug and ship "were not negligent
in any respect."

The primary issue upon this appeal
·centers around the effect of the "pilotage"
·clause in the contract between the par-
ties. The trial court has found that the
.services rendered were pursuant to a con-
·tract containing the following clause:

"Pilotage.

"When the captain of any tug fur-
nished to or engaged in the service
of assisting a vessel which is making
use of her own propelling power,
goes on board such vessel, or any
·other licensed pilot goes on board
.such vessel, it is understood and
.agreed that such tugboat captain or
licensed pilot becomes the servant
·of the owner of the vessel assisted in
respect to the giving of orders to
.any of the tugs furnished to or en-
.gaged in the assisting service and in
respect to the handling of such ves-
.sel, and neither those furnishing the
tugs and/or pilot nor the tugs, their
·owners, agents, charterers, operators
or managers shall be liable for any
damage resulting therefrom."

The trial court has also found that
·"The proof adduced by libellant does not

sustain its contention that the pilotage
clause was not effective." Not only was
it effective but the court gave credence to
the McAllister version that elimination
of the pilotage clause would call for an
increase on insurance rates and that pre-
vious settlements for damage claims were
made without prejudice to McAllister's
rights under the pilotage clause. Despite
the fact that the parties' business deal-
ings and rates set were based upon the
risks assumed under the contract as ac-
tually agreed upon, libelant now argues
that "The 'pilotage clause' clause should
be judicially declared invalid in the cir-
cumstances." This point was not raised
in the trial court. Nor was it made the
subject of any findings of fact upon which
the court premised the result reached.
The conclusions of law upon which the
trial court based its decision were that
(1) the pilotage clause formed part of the
contract between the parties; (2) the
docking pilot was negligent for failing to
properly assess the capacity of the tug in
the then-existing state of the tide; (3)
the negligence of the pilot proximately
caused the damage to the Hellenic Spirit
but that (4) such negligence on the part
of the pilot fell outside the scope of the
pilotage clause under which liability of
the McAllister was precluded.

Dealing first with the case as heard
and decided by the court below and ac-
cepting the facts as found, there is but
a single question of law: was the pilot's
negligence in docking the ship included
within the terms of the pilotage clause?
That clause, in effect, provides that when-
ever a tug captain goes on board to assist
the vessel being served by the tug he
becomes the servant of the owner of the
vessel "in respect to the giving of orders
to any of the tugs furnished to or en-
gaged in the assisting service and in re-
spect to the handling of such vessel."
The clause further provides that the tugs
and their owners shall not be liable for
any damage resulting from such orders.

The trial court was of the opinion that
"The negligent act of the pilot here was
primarily his having insufficient tug pow-
er available to assist in the docking. The

terms of the pilotage clause do not seem to embrace this act of negligence. It is clearly not negligence arising from 'the giving of orders to any of the tugs.'" Although admitting that "the term 'handling of [the] vessel' broadly construed might embrace the failure to have sufficient tug power," the trial court said that "narrowly construed that term can mean no more than the directing of the movements of the vessel itself." The court relied primarily upon People of State of California v. The Jules Fribourg, 140 F. Supp. 333 (N.D.Cal.1956).

In March 1962 when this case was tried and later when briefs were submitted, there is no indication that the trial court had the benefit of the decision in the Southern District of New York of Judge Friendly in Farrell Lines, Inc. v. S.S. Birkenstein, 207 F.Supp. 500 (S.D.N.Y. 1962). In that case a very similar fact situation was before the court. The claim was there made that insufficient tug power (one tug) was the cause of the collision of the Birkenstein with the dock. The court found that the towing company should have supplied a second tug but said with respect to the docking pilot:

> "But even if we should assume arguendo that Cray's failure to do something more about getting a second tug was outside the pilotage clause even though the failure occurred while he was on the Birkenstein, the accident was caused not by that failure but by his decision to allow the Birkenstein to go ahead without being sure another tug would meet her outside the mouth, and this constitutes action 'in respect to the handling of such vessel' within the pilotage clause. *If the alternative ground of decision in the Fribourg case, 140 F.Supp. at 340, should be to the contrary, and I am not at all sure that it is, I would not be able to agree with it.*" (Emphasis added.) Id. at 509.

■ From the moment the docking pilot took over the responsibility of docking the ship, he was giving orders and was handling it. He was aware of the power of his tug, the strength of the current, the time before slack water and the character of the area in which he had to maneuver. It was his decision to back out into the channel; his decision to bring the ship broadside along the end of the dock; and his decision in the light of all factors influencing the docking operation to do this in the belief that the Ellen F. McAllister was adequate for the purpose. He was clearly "handling" the ship and "giving" orders. To be sure his particular judgment in handling the docking may have been faulty and the method selected may have been better executed had there been another tug to assist. Even accepting the trial court's belief that a narrow construction of the pilotage clause "can mean no more than directing the movements of the vessel itself," this is exactly what the docking pilot was doing. His negligence was not the result of failing to order a second tug when he took command but rather in handling the ship in the way he did with the one assisting tug.

Factual differences and the nature of the claims distinguish Pennsylvania R. R. v. The S.S. Beatrice, 161 F.Supp. 136 (S.D.N.Y.1958), aff'd, 275 F.2d 209 (2d Cir. 1960). The interpretation of "handling" in Birkenstein seems closer to the situations facing docking pilots and, accordingly, we hold that the docking pilot's acts were within the terms of the pilotage clause.

■ There are no facts in the record to support libelant's argument that the pilotage clause should be judicially declared invalid. Libelant points to certain decisions arising in the Southern District of New York which it claims disclose pilotage clauses containing almost identical language in their contracts with shipping companies. From this similarity libelant reaches the conclusion that the towing companies in the New York Harbor area must have a monopoly and that, therefore, this court without further ado should declare such clauses invalid. Libelant assumes again without supporting proof that the towing companies are in a dominant or superior bargaining power

position in contrast to the comparatively helpless position of the steamship companies. A resolution of this factual issue was not before the trial court; to the contrary, it found the pilotage clause to be effective. The parties had bargained; they had fixed their rates knowing their respective liabilities; they had settled their claims for years, recognizing the effect of the clause. The applicable law was well declared by the Supreme Court in Sante Fe, P. & P. Ry. v. Grant Bros. Construction Co., 228 U.S. 177, 188, 33 S.Ct. 474, 478, 57 L.Ed. 787 (1913), the Court saying: "There is no rule of public policy which denies effect to their expressed intention, but, on the contrary, as the matter lies within the range of permissible agreement, the highest public policy is found in the enforcement of the contract which was actually made." In Sun Oil Co. v. Dalzell Towing Co., 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311 (1932), the pilotage clause was held to be effective and to define the rights of the parties, the Court stating:

"Respondent [tug owner] had no exclusive privilege or monopoly in respect of the services that petitioner desired to have performed for its tanker. And petitioner was under no compulsion to accept the terms of respondent's pilotage clause. There is nothing to suggest that the parties were not on equal footing or that they did not deal at arm's length." Id. at 294, 53 S.Ct. at 136.

\* \* \* \* \* \*

"The provision that its tug captains while upon the assisted ship would be the servants of her owner is an application of the well-established rule that when one puts his employee at the disposal and under the direction of another for the performance of service for the latter, such employee while so engaged acts directly for and is to be deemed the employee of the latter and not of the former." Id. at 294–295, 53 S.Ct. at 136.

\* \* \* \* \* \*

"And if the pilotage clause is valid, the tug captains while on board the tanker and respectively acting as her pilot were for that turn the servants of petitioner and the respondent [tug owner] *may not be held responsible for any act or omission of theirs during the period of that service.*" Id. at 293–294, 53 S.Ct. at 136. (Emphasis added.)

Libelant relies upon cases involving release-from-negligence clauses wherein the courts have deemed such clauses to be against public policy. However, there is a difference between the release-from-negligence clause and the pilotage clause, which difference the Supreme Court recognized in Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955) in which it said:

"Sun Oil did not involve a contract designed to relieve a towboat owner from liability for negligent towage. The contractual clause there involved related only to pilotage. The clause provided that a tug captain who piloted a vessel propelled on its own power should be considered the servant of that vessel *and that the tug owners should not be liable for his negligent pilotage.*" Id. at 92–93, 75 S.Ct. at 633. (Emphasis added.)

\* \* \* \* \* \*

"It is one thing to permit a company to exempt itself from liability for the negligence of a licensed pilot navigating another company's vessel on that vessel's own power. That was the Sun Oil case. It is quite a different thing, however, to permit a towing company to exempt itself by contract from all liability for its own employees' negligent towage of a vessel. Thus, holding the pilotage contract valid in the Sun Oil case in no way conflicts with the rule against permitting towers by contract wholly to escape liability for their own negligent towing." Id. at 94, 75 S.Ct. at 634.

Had the ship owner wished protection against the type of damage here suffered it might well have secured it at an appropriate rate. See Pannell v. Unit-

ed States Lines Co., 263 F.2d 497 (2d Cir.), cert. denied, 359 U.S. 1013, 79 S. Ct. 1151, 3 L.Ed.2d 1037 (1959). Having accepted towing services under an agreement providing for certain limitations of liability, libelant is not entitled to have this court rewrite the contract and impose liabilities not bargained for.

In the light of the finding that "Both the tug McAllister and the Hellenic Spirit promptly and properly carried out every order of the pilot Fitzgerald and were not negligent in any respect," there was no basis for a decree *in rem* against the tug McAllister.

Interlocutory decree reversed and libel (No. 28254, Ad. 199–132) dismissed.