**AMERICAN SMELTING AND REFIN- ING COMPANY, Plaintiff,**

v.

**PENNZOIL UNITED, INC., Defendant.**

**Civ. A. No. 3647.**

United States District Court
D. Delaware.

Jan. 24, 1969.

---

James M. Tunnell, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Daniel Gribbon, Henry Sailer and Robert Muth, Covington & Burling, Washington, D. C., of counsel, for plaintiff.

Richard F. Corroon, Potter, Anderson & Corroon, Wilmington, Del., Whitney N. Seymour, Eleanor Fox and Arthur Settles, Simpson, Thacher & Bartlett, New York City, John Bagalay, Jr., Baker, Botts, Shepherd & Coates, Houston, Tex., of counsel, for defendant.

## OPINION

WRIGHT, Chief Judge.

This is an action by plaintiff, American Smelting and Refining Company (Asarco), for a preliminary injunction restraining defendant, Pennzoil United, Inc. (Pennzoil), from acquiring a substantial ownership interest in Asarco by way of a tender offer to Asarco shareholders. Plaintiff bases its action on Section 7 of the Clayton Act, 15 U.S.C. § 18, alleging that a Pennzoil takeover of Asarco would substantially lessen competition in each of several lines of commerce in the United States. Jurisdiction is based on 28 U.S.C. §§ 1331, 1337 and 15 U.S.C. §§ 22, 26.

The subject matter of this action is the effect of a Pennzoil-Asarco combination on competition in the copper and molybdenum industries. Asarco is a New Jersey corporation with consolidat-

ed assets of more than $750 million engaged in exploration for and development of copper mines, mining and milling of copper ores, smelting and refining of copper concentrates, sale of refined copper, and production and sale of molybdenum. Pennzoil is a Delaware corporation with consolidated assets of more than $1 billion engaged, through its 99% owned subsidiary Duval Corporation (Duval), in exploration for and development of copper mines, mining and milling of copper ores, sale of refined copper, and production and sale of molybdenum. Duval is a comparatively recent entrant into the copper and molybdenum industries, commencing operations in 1959. Its significance in both industries, however, has increased rapidly and, with the opening later this year of its new Sierrita mine (the second largest domestic copper mine), its participation in both industries will more than double.

There is no dispute that Pennzoil seeks to acquire a substantial interest in Asarco. On January 22, 1969, Pennzoil made public a tender offer for "any and all outstanding shares" of Asarco stock. Nor is there any dispute that the acquisition is for the purpose of merging the two corporations and thus not solely for purposes of investment. See Liedtke Affidavit (filed December 20, 1968); Pennzoil Registration Statement, Amendment 1 to Form S-1, p. 5.

## I. THE CLAYTON ACT

██ Section 7 of the Clayton Act, 15 U.S.C. § 18, prohibits acquisition, in whole or in part, of the stock of a corporation "where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition * * *." Section 7 does not require a showing of existing or certain anti-competitive effects; indeed, its purpose is to interfere with movement toward undue concentration of economic power before anti-competi-

tive effects can manifest themselves. United States v. Philadelphia National Bank, 374 U.S. 321, 362, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); Vanadium Corporation of America v. Susquehanna Corp., 203 F.Supp. 686, 695 (D.Del. 1962). Accordingly, it is sufficient for the complaining party to establish a "reasonable likelihood * * * that the acquisition will result in a restraint of commerce * * *" United States v. E. I. duPont de Nemours Co., 353 U.S. 586, 592, 77 S.Ct. 872, 877, 1 L. Ed.2d 1057 (1957).

██ Injunctive relief is particularly suited to the preventive function of Section 7 and Congress has expressly extended the availability of the injunctive remedy to private parties. 15 U.S.C. § 26. The standards applicable to preliminary injunctive relief, sought here, are well-settled:

> "To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i. e., the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation."

Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2 Cir. 1953); see also Vanadium Corporation of America v. Susquehanna Corp., supra 203 F. Supp. at 697. In other words, plaintiff must demonstrate a reasonable probability of success on final hearing. United States v. Ingersoll-Rand Co., 320 F.2d 509, 525 (3 Cir. 1963).

Turning to the specific facts of this case, the Court will consider plaintiff's anti-trust allegations in terms of five separate lines of commerce—exploration for and development of copper mines,[1]

---

1. The Court has serious reservations as to whether exploration and development is properly considered a separate line of com-

merce. However, for purposes of analysis, the Court will assume, without deciding, that it is.

mining and milling of copper (as measured by domestic copper consumption), processing of copper concentrates (including both smelting and refining of copper), sale of refined copper to independent fabricators, and production and sale of molybdenum. The relevant geographic area for each line of commerce is the United States.

## A. EXPLORATION AND DEVELOPMENT

Both Asarco and Pennzoil are active in exploration for new copper deposits and in the development of new copper mines. Each corporation invests several million dollars annually on exploration and substantially more on development. See Strauss Affidavit, para. 11; PX–16. Indeed, of some 16 mines developed since World War II, two were efforts by Asarco, four by Duval.[2] Transcript of Hearing, January 16, 1969 (Tr.), p. 14.

However, activity in this line of commerce extends well beyond Asarco and Pennzoil. Of the 15 companies with significant participation in the domestic copper industry, 13 are active in exploration and development. Strauss Affidavit, Exhibit A. Furthermore, exploration activity extends well beyond the copper industry. Exhibit B to the Just Affidavit lists 17 companies outside the copper industry actively engaged in exploration for non-ferrous metals, including copper. And Asarco's Strauss testified that "There is intense activity in exploration for copper." Tr. 12.

Asarco argues, however, that, notwithstanding the vigorous activity in this line of commerce, the productivity of these efforts is low (only 16 mines since World War II) and that nearly one half of the concrete product of these efforts (6 out of 16 mines) is attributable to Asarco and Pennzoil. Thus, an Asarco-Pennzoil merger would eliminate a major portion of the meaningful competition in this area. Asarco argues further

that, should Pennzoil and Asarco combine, the sum total of effort devoted to exploration and development by the combined enterprise will be less than the total efforts of the two separate companies. Again, competition would be substantially reduced.

After careful review of the record, the Court is not persuaded that, as to this line of commerce, there is reasonable probability of demonstrating a Section 7 violation at final trial. The vast number of large enterprises engaged in exploration and development indicates vigorous and adequate competition. While it is true that only 16 mines have been developed in the past two decades, that figure is not a good index of productivity because it does not reflect the number of deposits actually discovered and held in reserve for future development. Finally, the Court is not convinced that a Pennzoil-Asarco combination would significantly affect the total effort devoted to this activity. Accordingly, the record provides no basis for concluding that a substantial lessening of the vigorous competition can be shown at final trial.

## B. MINING AND MILLING OF COPPER

Asarco and Pennzoil do not agree on the proper index for measuring the participation of the two corporations in this line of commerce. Asarco contends that "domestic mine production" is the proper measure; Pennzoil contends that "domestic copper consumption," which it defines as domestic mine production plus imported copper plus scrap copper, is the proper measure. See Cohen Affidavit, para. 6.

After considering each argument, the Court concludes that domestic copper consumption is the proper index for measuring market shares in this line of commerce. However, the Court does not accept the definition of domestic copper consumption put forth by Penn-

2. One of these four mines, the Sierrita mine, is not yet in production but opera-

tions are scheduled to begin later this year.

zoil, nor does the Court accept the figures provided by Pennzoil.[3] Specifically, the Court does not agree that "toll scrap" should be included in the definition of copper consumption for the reasons set forth by Strauss, Tr. 66–71. See Cohen Affidavit para. 7. And the Court does not agree that the quantity of copper released from Government reserves in 1966 should be included in the 1966 consumption figures.[4] Tr. 74.

Taking these adjustments into account, Cohen's 1966 copper consumption figure of 2,359,954 tons of copper per year should be reduced by 323,000 tons per year (toll scrap. See Tr. 71) and 150,000 tons per year (Government release. See Tr. 74) to 1,886,954 tons per year. By the same token, Cohen's estimate for 1970 becomes 1,973,753 tons per year,[5] the figure which the Court considers relevant to determination of market shares.

The record indicates that the correct estimates for 1970 market participation by the parties to this suit are 130,000 tons per year for Asarco,[6] Tr. 76, and 122,700 tons per year for Duval, Cohen Affidavit, para. 8. Accordingly, Asarco's 1970 market share will be 6.58%, Pennzoil's 6.22% and the combined share will be 12.8%.

The copper industry is properly characterized as highly concentrated, the top four companies having 70% of the total market. A Pennzoil-Asarco combination would, in view of the market shares involved, increase concentration more than an insignificant amount, a result contrary to the warning in United States v. Philadelphia National Bank, supra, that:

> " * * * if concentration is already great, the importance of preventing even slight increases in concentration and so preserving the possibility of eventual deconcentration is correspondingly great." 374 U.S. at 365, n. 42, 83 S.Ct. at 1742 (1963).

The combination would also run afoul of the merger guidelines of the Department of Justice, see Pennzoil's Memorandum in Opposition to Plaintiff's Motion, p. 23.

Accordingly, the Court finds that, in this second line of commerce, Asarco has established a reasonable probability of demonstrating a Section 7 violation on final trial.

## C. PROCESSING OF COPPER CONCENTRATES

At present, virtually all copper concentrates are processed by smelting followed by refining. Asarco is the third largest smelter (17% of domestic smelting capacity) and the second largest refiner (28% of domestic electrolytic refining capacity) in the nation. In addition to processing its own production, however, Asarco also engages heavily in custom smelting and refining, i. e., processing concentrates produced by other companies.

Duval is not engaged in the business of processing concentrates. Instead, it relies completely on available custom processing capacity, particularly that of

---

3. The Court will consider the definition and figures set forth in the Cohen Affidavit. While the Just Affidavit is intended to serve the same function, the Court finds the same errors in it as in the Cohen Affidavit plus one additional error (inclusion of scrap alloy metals, considered by Strauss in his testimony, Tr. 79–83), making it less desirable than the Cohen Affidavit.

4. While 1967 figures are available for the copper industry, they are severely distorted by the effects of an industry-wide strike. Hence, the Court will rely, where necessary, on 1966 figures.

5. This extrapolation is based on Cohen's conversion index of 1.046 (2,471,427/2,-359,954 = 1.046. See Cohen Affidavit, para. 8).

6. Cohen's figure of 85,000 tons per year for Asarco, Cohen Affidavit, para. 8, fails to take into account copper imported and scrap purchased by Asarco. Strauss estimates those figures to be 20,000 tons per year and 25,000 tons per year respectively. Tr. 76–77. The Court will assume that Cohen's figures for Duval do not reflect the same error.

Asarco. Estimates indicate that, by the end of 1969, Duval will supply more than one-third of all concentrates processed by custom smelters and refiners. Strauss Affidavit, para. 18. And the record shows that, when Duval commences production at its Sierrita mine, it will be the largest domestic concentrate producer with no smelting and refining of its own. According to the evidence, Duval has time and time again considered entry into the smelting and refining business. See PX 24, 25, 29, 30. Each time, however, Duval has made the decision not to enter. Indeed, Duval has recently consummated a ten-year contract with Asarco for processing of all concentrates emanating from its giant Sierrita mine; it seems likely that Duval will also renew a ten-year contract with Asarco covering production at its Esperanza mine. Tr. 113.

While these contracts presumably reflect Duval's intention not to enter conventional smelting and refining for at least ten years, Duval apparently has not decreased its efforts to discover new methods of processing copper concentrates. PX–32. Duval's activity in this respect is apparently far from unique; considerable time and money is evidently being devoted by many members of the industry to the development of new methods for processing concentrates which will avoid the bothersome inefficiencies (e. g. air pollution) associated with smelting and refining. Tr. 61–64. The Court considers efforts to develop alternatives to smelting and refining highly relevant to the competitive structure of the smelting and refining industry. And Duval's position in the industry makes it a likely entrant into processing by methods other than conventional smelting and refining.

In light of the foregoing, Asarco alleges that, while Duval is not now a likely entrant into the conventional smelting and refining market, it will indeed be the most likely entrant once its processing contracts expire or are cancelled. In addition, should Duval develop a new technique for processing, it would in some manner represent a distinct competitor in the processing industry. Accordingly, a Pennzoil-Asarco combination will eliminate Duval as the most likely entrant in the conventional processing market and, by thwarting Duval's effort to develop new methods, as a most likely entrant in possible new processing markets.[7]

While the Court is troubled by the complexity of the argument and the significance of the Pennzoil-Asarco contractual arrangements, it concludes that Asarco has raised a substantially serious question with regard to the effect of this proposed combination on potential competition in this line of commerce. Ten year contracts are not immutable and are by no means as permanent as a corporate amalgamation. The effect of a merger on Duval's competitive position ten years hence most certainly has some relevance to the competitive impact of the combination. This problem is indeed "a fair ground for litigation and thus for more deliberate investigation." Hamilton Watch Co. v. Benrus Watch Co., supra 206 F.2d at 740.

The Court notes one additional question regarding this particular line of commerce, namely, the impact on competition of Duval's integration into smelting and refining. Duval is by any standard a significant producer of cop-

---

7. According to Professor Turner, a general rule of thumb in considering the effect of a merger on potential competition is as follows:

"The most likely entrant into a market may not acquire one of the two to six sellers (or dominant sellers) in an industry."

Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L.Rev. 1313, 1369 (1965). Here, Duval is alleged to be the most likely entrant into the processing industry and the record indicates that, in smelting and refining combined, there are but 6 dominant sellers, one of which is Asarco. Tr. 32.

per concentrates. And Professor Just notes, Just Affidavit, para. 29:

"If a significant producer of copper concentrates should integrate into smelting and refining, the supply of concentrates for custom smelting and refining would accordingly be reduced, further tending to weaken the [competitive] position of the custom smelter and refiner."

The Court considers this effect of the proposed vertical integration equally as serious as the horizontal effects of the combination discussed above. It thus represents an additional factor worthy of further investigation on final hearing.

## D. SALE OF REFINED COPPER TO INDEPENDENT FABRICATORS

■ The great majority of companies with significant participation in the domestic copper industry, including Asarco and Duval, engage in the sale of refined copper to fabricators.[8] A considerable portion of these sales, however, are to captive fabricators, i. e., fabricators owned or controlled by the seller. The remainder are made to noncaptive, or independent fabricators. Neither Asarco nor Duval has captive fabricators [9] and neither sells more than an insignificant amount to competitors' captive fabricators.

Pennzoil and Asarco do not agree on the relevant line of commerce in dealing with these sales. Pennzoil contends that the line of commerce should be sales to all fabricators, both captive and independent; Asarco contends that sales to independent fabricators is the proper realm of inquiry. In view of the ability of a controlling copper producer to regulate its captive fabricator's purchases from outside producers and the reluctance of outside producers to rely on an ability to sell any substantial quantity of copper to captive fabricators, Tr. 54–55, the Court accepts Asarco's view that sales to independent fabricators is the relevant line of commerce.

Asarco's participation in this line of commerce is substantial. Indeed, Asarco is the second largest domestic supplier to independent fabricators. Tr. 56. Proposed volume of Asarco's sales for 1970 is 240,000 tons, or 18% of an estimated market of 1,325,000 tons. Strauss Affidavit, Exhibit D. Asarco's share of this market in 1966 was, again, 18%.

Duval is a brand new entrant into this line of commerce, with its first sale in October, 1968. Tr. 58. However, with the opening of its new Sierrita mine, Duval proposes to increase significantly its share of the market. To this end, Duval's processing contract with Asarco provides that one-half of the Sierrita production is to be processed on toll and returned to Duval for sale. See PX–33, 35. Duval estimates Sierrita copper production to total 120,000 tons per year by 1970. Deducting the share committed to the Government, 102,500 tons will go to Asarco for processing and thus about 50,000 tons will be returned to Duval for sale. Tr. 59; see Strauss Affidavit, Exhibit D. Accordingly, Duval's market share in 1970 will be 3.8%. The market share of the combined enterprise will be 21.8%.

The open market sale of refined copper is a concentrated industry, the top four companies having more than 67% of the market. Increase in this concentration by nearly 4% is more than insignificant and the warning of United States v. Philadelphia National Bank, supra, recited earlier is applicable. In addition, a

---

8. Those companies with no refining capacity of their own but with a desire to sell refined copper arrange with a custom refiner to have their own production refined and the refined product returned. A fee or "toll" is charged for the refining.

9. Asarco does own a large minority interest in two fabricators, General Cable Company and Revere Copper & Brass. However, both fabricators are considered independent in view of a consent decree which requires that Asarco sell to both on terms no more favorable than those extended to any other customers. Together, General Cable and Revere account for less than one-third of Asarco's sales of refined copper. Tr. 51–52.

Pennzoil-Asarco amalgamation would violate the merger guidelines of the Department of Justice. See Pennzoil's Memorandum in Opposition to Plaintiff's Motion, p. 23.

Accordingly, the Court finds that, in this fourth line of commerce, Asarco has established a reasonable probability of demonstrating a Section 7 violation on final trial.

### E. PRODUCTION AND SALE OF MOLYBDENUM

█ The molybdenum industry is a highly concentrated industry consisting, at present, of two major producers and six or seven minor producers (copper producers which recover molybdenum as a by-product). Tr. 84–85. The two major producers account for about three-quarters of domestic production.

Duval and Asarco are currently minor producers of molybdenum. However, when Duval's Sierrita mine begins production, Duval will be elevated to the category of a major domestic producer, ranking either second or third. Tr. 85–86; Ex. 22. While accurate estimates are unavailable, Duval's anticipated 1970 market share will range between 12–15%. See Exhibit 22. And once Duval begins increased production, the top three producers will account for nearly 90% of the market.

Asarco will remain a by-product producer with a market share of 1%. Accordingly, a Pennzoil-Asarco combination will increase the industry combination by 1%. While, in an ordinary situation, this increase in an extremely concentrated industry would cause concern, the Court is of the opinion that the unusual competitive outline of the molybdenum industry reduces the increase to insignificance.

Exhibit 22 provides an excellent summary of the competitive situation in this line of commerce. As it explains, the industry is characterized by a large over-supply of molybdenum, with production in 1970 expected to exceed demand by some 35 million pounds. In addition, recent activities of foreign producers threaten to close off an important segment of the world market to domestic producers,[10] lowering demand for domestic production even further. In light of these developments, it is anticipated that Duval will be required to stockpile some portion of its new production.

Taking these economic factors into account, the Court is not convinced that an increase in concentration of 1% will have a noticeable effect on competition or competitive pricing. Accordingly, Asarco has not demonstrated reasonable probability of success on final trial of this issue.

In summary, the Court concludes that, in three out of the five relevant lines of commerce, Asarco has made sufficient showings under the Clayton Act to justify the preliminary relief requested. There remains for consideration, however, the question of irreparable injury.

### II. IRREPARABLE INJURY

█ Notwithstanding a demonstration of likelihood of success on final trial of the anti-trust issue, plaintiff is not entitled to the extraordinary remedy of a preliminary injunction in the absence of a showing of a balance of hardship in favor of injunctive relief. See Hamilton Watch Co. v. Benrus Watch Co., supra, 206 F.2d at 740. In determining this balance, the Court should properly consider injury to the public as well as injury to the immediate parties. See Vanadium Corporation of America v. Susquehanna Corp., supra 203 F.Supp. at 696; 7 Moore, Federal Practice, ¶ 65.04 [1], p. 1628. Indeed, if probable anti-competitive effects may reasonably be expected to manifest themselves in the interim between denial of preliminary relief and final determination of the merits and those anti-competitive effects are ir-

---

10. The world market is crucial to this industry in view of the fact that one-third of domestic production is exported. Tr. 87.

reversible, the injury to the public which follows is entitled to considerable weight. See United States v. Wilson Sporting Goods Co., 288 F.Supp. 543, 568–570 (N.D.Ill.1968).

 Here, in view of the imminence of the Pennzoil takeover and the reasonably long period of time which might be required to prepare for final hearing, the likelihood of injury to the public is more than speculative and thus entitled to consideration by the Court.

In addition, however, the Court concludes that the balance of possible harm to the parties tips in favor of Asarco. Aside from the impact of consolidation on the morale of Asarco personnel, the Court feels that the disruption of business inevitably precipitated by a takeover and the inadequacy of subsequent divestiture to remedy much of the damage, see Crane Co. v. Briggs Mfg. Co., 280 F.2d 747, 750 (6 Cir. 1960), constitute sufficient harm to Asarco to outweigh any foreseeable injury to Pennzoil.

Considering irreparable injury to the public together with the balance of harm to the parties in favor of plaintiff, the Court finds that plaintiff has demonstrated adequate injury to warrant preliminary injunctive relief.

Plaintiff's motion for a preliminary injunction is granted. In view of the imminent exchange of stock pursuant to Pennzoil's tender offer,[11] the Court will enter an order in accordance with this opinion. Security, as required by Federal Rule of Civil Procedure 65(c), is set at $300,000. In the event that either party considers this amount improper, the Court will promptly hear any motion requesting either an appropriate increase or decrease of the amount. 7 Moore, ¶ 65.09, pp. 1656–57.

The foregoing opinion is adopted as the Court's Findings of Fact and Conclusions of Law in accordance with F.R.Civ. P. 52(a), 28 U.S.C.A.

11. By the terms of the tender offer, "Exchange will be made as soon as prac-

ticable after January 27, 1969 * * *."