364 F.2d 118
 3 A.L.R.Fed. 187
 Petition of MARINA MERCANTE NICARAGUENSE, S.A., as owner of
the MOTOR VESSEL EL SALVADOR, for exoneration from
or limitation of liability, Petitioner-
Appellant-Appellee. Petition of McALLISTER BROTHERS, INC.,
as owner of the TUG RUSSELL NO. 18 for exoneration
from or limitation of liability,
Petitioner-Appellee-Appellant.
 No. 384, Docket 30306.
 United States Court of Appeals Second Circuit.
 Argued May 24, 1966.
Decided July 21, 1966.
 
 Victor S. Cichanowicz, New York City (Cichanowicz & Callan, New York City, Stanley R. Wright, William P. Larsen, New York City, of counsel), for Marina Mercante Nicaraguense, S.A.
 Christopher E. Heckman, New York City (Foley & Martin, New York City, Thomas J. Irving, New York City, of counsel), for McAllister Brothers, Inc.
 Thomas E. P. McElligott, New York City (Fields, Rosen, McElligott & Auslander, New York City), for claimant, Virginia Ruth Evans.
 John J. Purcell, New York City (Lilly, Sullivan & Purcell, New York City, Frank C. Mason, New York City, of counsel), for claimant, Catherine Marie Fargo.
 Martin J. McHugh, New York City (Mahar & Mason, New York City), for claimant, Theresa F. Salvesen.
 Before FRIENDLY, HAYS and FEINBERG, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 In a typically thorough opinion, 248 F.Supp. 15 (1965), to which we refer for a full account of the facts, Judge Weinfeld in the District Court for the Southern District of New York found Marina Mercante Nicaraguense, S.A., owner of the M/V El Salvador, and McAllister Brothers, Inc., owner of the Tug Russell 18, liable for the deaths of three crewmen drowned when the tug sank in the Port Elizabeth Channel in New Jersey on September 20, 1962. He allowed the death claims in an aggregate of $406,175, directed payment first out of the tug's limitation fund of $70,000 and then out of the El Salvador's fund of $535,172, denied McAllister's claim for damage to the tug, and dismissed Marina's and McAllister's claims for indemnification from each other. All five parties have appealed, the death claimants criticizing the awards as insufficient and each owner seeking to place the entire blame on the other.
 
 I.
 
 2
 The judge found that the El Salvador caused the Russell 18 to strike a mud bank on the northerly side of the Port Elizabeth Channel when, with the tug's line secured to her port side, she put on full speed ahead and, moving through the water at 7 knots, threw her helm hard astarboard to turn into Newark Bay Channel. The impact with the mud bank forced the tug's rudder and steering gear to a starboard position beyond their normal stops and the digging of the propeller into the bank slowed her speed. Pulled along by the line securing her bow to the deck of the EL Salvador above her starboard beam, and at the same time dragged through the ship's starboard turn, the tug developed a heavy list to port. Having only a one foot freeboard, she took water and, after the line securing her to the EL Salvador was cut, quickly capsized. One crewman was trapped on board; two others drowned before rescue arrived.
 
 
 3
 Marina's attack on these findings as clearly erroneous faces the usual hazards and some additional ones as well. The most critical is the lack of another explanation anywhere near so convincing for the sudden sinking of a tug in calm waters; the much emphasized instability of the Russell 18, of which more hereafter, was not shown to have been of such moment that it alone could have produced the catastrophe. Judge Weinfeld thus was clearly justified in adopting an explanation consistent with reported facts and backed by expert opinion. The only criticism calling for comment stresses the testimony of an employee of the Port of New York Authority that four buoys on the tug's port side were in 35' of water-- thus making it impossible for the tug to have run aground. But this evidence was contradicted by a tug captain who testified that the buoys lay outside the navigable channel in shallow water and that a tug would touch bottom if it was parallel to a buoy and 30' away.[1]
 
 
 4
 Acceptance of the trial court's explanation of the cause of the accident automatically validates the finding of fault on the part of the EL Salvador, with consequent liability to the extent of her limitation fund. However, the important and interesting controversies between Marina and McAllister make it necessary to go further and determine with more precision the faults attributable to the El Salvador. These divide themselves into two categories-- acts causing the Russell 18 to strike the mud bank and failure to take action that might have saved her or her crew once she did. Although Skogen, the McAllister pilot who went aboard the EI Salvador, had set a course down the middle of the channel, this evidently was not kept by the helmsman. Skogen, whose attention was centered on trying to locate a missing buoy on the starboard side, conceded he was uncertain whether the prescribed course was being held, and failed to ascertain the distance between the El Salvador and the left bank of the channel when he ordered a hard turn to starboard. A serious fault in the second category was the failure of the boatswain of the El Salvador, who was stationed at the cleat where the tug's line was made fast, immediately to report his observation of the tug listing heavily to port, water going over her, and several of her crew yelling excitedly. Instead of shouting forthwith to the bridge, he ran forward and up a ladder to call the mate who was standing by the anchor at the bow; they then descended the ladder and, with some difficulty, cut the line, still without communicating with the bridge. Only after the line was severed did the master of the EI Salvador become aware of the situation, and then not from any report but by observing the tug's disappearance from her position in front of the bridge, an observation that he passed on to Skogen. Minutes or even seconds were vital; Skogen testified that if he had been promptly notified of the tug's plight, he would either have put the El Salvador's engines full astern and dropped an anchor or swung the ship hard to port and beached her. By the time Skogen learned the facts, the El Salvador had first to stop her propeller to avoid injuring the tug or the men in the water, and then to continue her turn into the Newark Bay Channel to avoid collision with an oncoming tanker.[2] It is unnecessary to pass upon the judge's conclusion that still other faults were committed, since these suffice for disposition of the case.
 
 II.
 
 5
 McAllister does not dispute that if the judge was warranted in finding negligence on the part of its employee Skogen, the standard New York Harbor pilotage clause contained in its contract with Marina[3] would not exempt it from liability to the death claimants. Pennsylvania R.R. Co. v. The Beatrice, 275 F.2d 209, 213-214 (2 Cir. 1960). However, as we also held in that case, the pilotage clause would entitle McAllister to indemnification from the El Salvador for liability thus fastened upon it.[4] See also Sun Oil Co. v. Dalzell Towing Co., 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311 (1932); Moran Towing & Transp. Co. v. Navigazione Libera Triestina, S.A., 92 F.2d 37 (2 Cir.), cert. denied, 302 U.S. 744, 58 S.Ct. 145, 82 L.Ed. 575 (1937).[5] And McAllister vigorously challenges the judge's holding that fault attributed to the Russell 18 requires application of the tug's limitation fund to satisfy the death claims for which the El Salvador's is sufficient, and denial of its claim for damage to the tug against the balance of that fund.
 
 
 6
 In 1956 the previous owner of the Russell 18 had installed its reconditioned engine 21' or 22' off center to port, thereby creating a slight port list of a couple of degrees. To compensate for the uneven distribution of weight, the crew adopted the practice of carrying 100 gallons more fuel oil in the starboard than in the port wing tank, from neither of which was fuel commonly needed in harbor operations. On the day of the accident the excess in the starboard tank was only 700 gallons. Also, as a result of a leak in the No. 4 tank, about 11' of fuel had accumulated in the lazarette or after-peak, a small compartment at the stern of the tug, which the engineer ought to have pumped out.[6]
 
 
 7
 Our very acceptance of the judge's findings as to the circumstances of the accident creates some difficulty in adopting his conclusion that the condition of the tug had a significant causal relation even if the issue were solely between McAllister and the death claimants. Marina, though harping on the facts just recited, adduced no expert testimony to counter McAllister's evidence that their effect on the tug's stability was small and indeed probably negligible. The port list was only 'a couple of degrees' without any correction, but substantial correction had been made and the judge was left to speculate what list, if any, the tug would have with more than two tons of excess ballast in the starboard wing tank as against the usual three. It was undisputed that until the Russell 18 fell in alongside the El Salvador after the undocking, she had been operating on an even keel; that any tug made fast to the port side of a larger and higher vessel will have some list to port; that the condition will be augmented by an increase in the speed of the vessel as compared with that of the tug; and that it will be further increased by a turn of the vessel to starboard. In the face of all this it is hard to attribute the tug's slight initial list alongside the El Salvador or the increasing list thereafter to the chief engineer's failure to maintain the full excess of 1000 gallons in the starboard wing tank and the fuel accumulated in the lazarette.[7] More important, it is altogether plain that no list due to lack of the extra 300 gallons, even as aggravated by the loose fuel, would have driven her against the mud bank. Once the ship caused that to happen and was dragging the tug along with her rudder jammed in an extreme starboard position, this minor imbalance would appear to have had negligible significance in causing the tug to go so far over as to take on water and capsize. The Supreme Court's disapproval of the 'broad proposition' that 'claims which might be said to touch upon naval architecture can never succeed without expert evidence,' Salem v. United States Lines Co., 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962), does not mean that a party can always succeed without it, especially when his adversary has provided some. Left to rely on our 'common understanding.' United States Smelting Co. v. Perry, 166 F. 407, 415 (8 Cir. 1909), quoted in Salem v. United States Lines Co., supra, we would suppose that even the most perfectly balanced tug would develop a critical port list if her propeller was digging in mud, her rudder had been broken and shoved hard to starboard, and she was being pulled by a larger vessel turning to starboard at a 7 knot speed. On this basis the faults of the tug, whether characterized as negligence or unseaworthiness, would not constitute a sine qua non cause. See Prosser, Torts 41 and cases cited in notes 11-17 (1964); Hart and Honore, Causation in the Law 103-08 (1959); Curtis Bay Towing Co. of Va. v. Southern Lighterage Co., 200 F.2d 33, 35 (4 Cir. 1952).
 
 
 8
 We find it unnecessary to determine whether despite these considerations, the rule of McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954), would forbid reversal of the finding of causal relationship and the consequent judgment for the death claimants against the tug. Acceptance of the finding still would not dispose of McAllister's right to indemnity from liability to the death claimants and recovery for damage to the tug from the El Salvador's sufficient limitation fund. The judge denied this on the basis that, the tug being itself at fault, this was a both-to-blame situation in which her only right would be to contribution on paying more than half the damages. Petition of the A. C. Dodge, Inc., 282 F.2d 86, 88-89 (2 Cir. 1960). In our view this ruling failed to take adequate account of the doctrine of the last clear chance, the application of which in admiralty was discussed in Petition of Kinsman Transit Company, 338 F.2d 708, 719-721 (2 Cir. 1964), cert. denied, Continental Grain Co. v. City of Buffalo,380 U.S. 944, 85 S.Ct. 1026, 13 L.Ed.2d 863 (1965). We there pointed out that although a third party may be able to recover from both of two persons whose negligence contributed to an accident, the last clear chance doctrine may allow one of these to recover from the other, even under the common law rule as to contributory negligence. Although stressing that the doctrine had been 'utilized in admiralty quite selectively,' we recognized it had been applied 'to free a claimant from the consequences of a rather low degree of negligence in creating a dangerous situation of which the party whose activity led to the damage was well aware and which he could easily have overcome.' We cited as one example a line of cases 'where the vessel committing the later fault was contractually bound to care for the one guilty of an earlier fault of which the vessel held solely liable had become aware.' Henry Du Bois Sons Co. v. Pennsylvania R.R., 47 F.2d 172 (2 Cir. 1931); Chemical Transporter, Inc. v. M. Turecamo, Inc., 290 F.2d 496 (2 Cir. 1961).
 
 
 9
 The situation when the El Salvador's boatswain and mate learned of the tug's plight reasonably falls within these descriptions. When the boatswain first heard the men yelling on the tug, she was listing about two feet and taking water; by the time he cut the line under the mate's supervision, she was listing three feet and 'was taking in a lot of water.' The judge accepted the testimony that if the facts had been promptly reported to the bridge, the tragedy would probably have been averted. 248 F.Supp. at 22. Since, with respect to liability to third parties, the pilotage clause entitles McAllister to indemnity from the negligence of Skogen as pilot of the El Salvador and the last clear chance doctrine protects it vis-a-vis the ship from the consequences of the earlier fault of the tug, the principle of equal division in both-to-blame accidents is inapplicable and the death claims should be satisfied solely from the El Salvador's sufficient limitation fund.
 
 
 10
 McAllister's claim for damage to the tug up to the balance in the El Salvador's fund raises a somewhat different issue. Judge Weinfeld correctly held that the pilotage clause would not entitle McAllister to recover from the El Salvador for Skogen's negligence; as said by the Supreme Court, an agreement that one shall not be liable for negligence of a third person 'cannot easily be read as an agreement that one is entitled to collect damages for negligence of that third person.' United States as Owner of The S.S. Christopher Gale v. Nielson, 349 U.S. 129, 131, 75 S.Ct. 654, 656, 99 L.Ed. 939 (1955). But that common-sensible rule does not deprive McAllister of a claim for the negligence of the boatswain and the mate in failing to make prompt report of the tug's peril. Since, as we have held, the last clear chance doctrine insulates McAllister as against the ship from what we have doubtingly assumed to be the causal effect of its fault with respect to the stability of the tug, the ship's only remaining defense depends on Skogen's negligent acts on board her. Under the restricted application of last clear chance in admiralty, McAllister cannot be relieved on that ground from responsibility for acts of Skogen which were the prime cause of the tragedy, see Petition of Kinsman Transit Company, supra, 338 F.2d at 720-721, and we are thus left to consider the pilotage clause, see fn. 3. Although the precise holding in United States as Owner of The S.S. Christopher Gale v. Nielson,supra, was that a tug company may not 'collect damages for injury to its own tug due to the negligent pilotage by one of its tug captains,' 349 U.S. at 131, 75 S.Ct. at 656, the rationale of the decision is that, except for damage to the assisted vessel and to third parties, the pilot remains the servant of the tug owner. Just as the clause may not be invoked by the tug owner to impose liability on the ship for injury to the tug, see States Marine Corp. of Del. v. Victory Carriers, Inc., 272 F.2d 463, 469 (9 Cir. 1959), so also it should not be available to cut off an assertion of contributory negligence when the pilot's employer seeks damages for its tug in a case where there was causal fault both by the pilot and by the ship's personnel. On the other hand, we perceive no reason why the pilot's negligence should have a more drastic effect on McAllister's claim than would negligence of the tug itself; the case is appropriate for the admiralty rule of divided damages. McAllister is thus entitled to recover half the damage suffered by the Russell 18 from the balance of the ship's limitation fund remaining after satisfaction of the death claims.
 
 III.
 
 11
 The only significant point raised by the claimants' appeals from Judge Weinfeld's painstaking computations of their damages concerns a deduction of the federal and state income taxes that he estimated would have been payable by the decedents on future earnings. It is undisputed that claimants' rights against Marina arise under the New Jersey Wrongful Death Act, N.J.Stat.Ann. 2A:31.1 et seq. and against McAllister undur the Jones Act, 46 U.S.C. 688. Counsel appear to agree that New Jersey decisions cast no light on the law of that state with respect to the deduction of income tax from future earnings in computing awards for death or disability.
 
 
 12
 In McWeeney v. New York, N.H. & H.R.R. Co., 282 F.2d 34, 35-39 (2 Cir.), cert. denied, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960), this court sitting in banc laid down the rule to be followed on deductions for income taxes 'where the question is one of federal law or the applicable state law is silent.' 282 F.2d at 39. We there held that estimated future income taxes should not be deducted in 'the great mass of litigation at the lower or middle reach of the income scale, where future income is fairly predictable, added exemptions or deductions drastically affect the tax and * * * the plaintiff is almost certain to be undercompensated for loss of earning power in any event.' The undercompensation would arise from the erosion of the recovery due to the failure to award attorneys' fees, almost always high in this type of litigation because of their contingent nature, and to continuing inflation;[8] we noted also that deduction of the income tax on the estimated earnings simpliciter took no account of the tax payable on the income from the lump sum awards given to replace them, see Meehan v. Central R.R., 181 F.Supp. 594, 623-624 (S.D.N.Y.1960)-- a factor particularly important in death cases, both because the loss of earnings is total and because the income from the lump sum will be taxable without benefit of income splitting unless the surviving spouse remarries. We recognized, however, that in cases 'at the opposite end of the income spectrum,' failure to deduct for taxes would result in an award that 'would be plainly excessive even after taking full account of the countervailing factors we have mentioned'; in such cases some appropriate adjustment should be made. Although the exact issue in McWeeney was whether a jury should be instructed to make a deduction for income taxes and the opinion relied in part on the difficulties jurors would encounter in doing this, the decision was not so limited. Indeed, as the foregoing summary makes evident, most of the reasons given for the rule there adopted are equally pertinent when the award is by a judge-- perhaps even more so since the judge attempts accurate calculations whereas 'we know full well that the give and take of the jury room is in round figures and does not deal in actuarial tables, decimal points and percentages.' 282 F.2d at 42 (dissenting opinion of Chief Judge Lumbard). Accordingly we have held McWeeney to be applicable where the award was by a judge. Montellier v. United States, 315 F.2d 180, 186 (2 Cir. 1963); Cunningham v. Rederiet Vindeggen A/S, 333 F.2d 308, 314-315 (2 Cir. 1964).
 
 
 13
 The McWeeney rule, like many a compromise, is not very satisfactory as a solution save in the important sense of being more acceptable than either of the polar proposals. Although the opinion recognized the impossibility of drawing a bright line that would show just when income had reached a level requiring some deduction to be made, it did not leave trial courts wholly without guidance. We said, in a passage previously quoted, that deduction should not be made in 'the great mass of litigation at the lower or middle reach of the income scale' and that 'the line was not approached' by a bachelor earning $4,800 a year. The illustrative examples where a deduction would be required were the cases of a plaintiff with 'potential earnings of $100,000 a year,' and the House of Lords decision, British Transp. Comm'n v. Gourmley, (1959) A.C. 185, where income taxes would have taken 82% of the estimated earnings. The opinion did not suggest that the exception was to be limited to such extreme cases; indeed it has subsequently been held applicable to a geologist with anticipated annual income of $16,000 and $25,000. LeRoy v. Sabena Belgian World Airlines, 344 F.2d 266, 276 (2 Cir.), cert. denied, 382 U.S. 878, 86 S.Ct. 161, 15 L.Ed.2d 119 (1965). We see no basis, however, for thinking that workers on tugboats in New York harbor should be considered among those high income earners to which the exception applies. The estimated annual earnings here, $11,000 to $11,500 for Fargo, $9,300 to $10,500 for Salvesen, and $11,000 to $11,500 for Evans, bear more resemblance to McWeeney's $4,800, Montellier's $12,000 and Cunningham's $6,300, all factored upward for subsequent inflation, than to Dr. LeRoy's $16,000 to $25,000 estimated to produce total future income of some $600,000. Death cases, where the deprivation of earnings is certain, would seem particularly poor candidates for extending the deduction.
 
 
 14
 We therefore direct that the decree be modified by increasing the awards in paragraphs 3, 4 and 5 to restore the sums deducted for taxes on future income; by amending paragraph 6 to grant the claim of McAllister against Marina for halfdamages to the Russell 18 in the sum of $49,191 with interest at 4% per annum from September 20, 1962, to the date of judgment, subject to limitation and to prior payment of the death claimants out of the EI Salvador's limitation fund; by eliminating paragraph 8 and providing that upon payment of the death claimants' judgments a decree shall be entered discharging McAllister Brothers, Inc. and the Russell 18 from all further liability; and by amending paragraph 9 to provide for the payment by Marina into the registry of the Court of the sum of $535,172 with interest at 6% per annum from April 3, 1963, to satisfy the judgments of the death claimants and, subject thereto, the claim of McAllister for half damages to the tug, with leave in the alternative to make direct payment. The death claimants and McAllister may recover costs on appeal against Marina. If the form of decree cannot be agreed upon, it may be settled on five days' notice.
 
 
 
 [1]
 There was also evidence that the motion of the EI Salvador pushed the water ahead of it in the narrow channel, thereby lowering the level a few inches
 
 
 [2]
 It was the latter's tugs that rescued the four crewmen who were saved
 
 
 [3]
 'When the captain of any tug furnished to or engaged in the service of assisting a vessel which is making use of her own propelling power, goes on board such vessel, or any other licensed pilot goes on board such vessel, it is understood and agreed that such tugboat captain or licensed pilot becomes the servant of the owner of the vessel assisted in respect to the giving of orders to any of the tugs furnished to or engaged in the assisting service and in respect to the handling of such vessel, and neither those furnishing the tugs and/or pilot nor the tugs, their owners, agents, charterers, operators or managers shall be liable for any damage resulting therefrom.'
 
 
 [4]
 In view of this and of the sufficiency of the limitation funds we find it unnecessary to pass upon Marina's contention that McAllister's liability to the death claimants for Skogen's acts on board the EI Salvador would not be subject to limitation under 46 U.S.C. 183. See Gilmore & Black, Admiralty 677 n. 45 (1957)
 
 
 [5]
 McAllister would not be entitled to indemnification for negligent acts of Skogen before boarding the EI Salvador or for inproper manning of the tug, see Farrell Lines, Inc. v. The S/S Birkenstein, 207 F.Supp. 500 (S.D.N.Y.1962); Transpacific Carriers Corp. v. The Tug Ellen F. McAllister, 336 F.2d 371 (2 Cir. 1964). But the judge did not sustain Marina's claims in that regard and we see no basis for doing so
 
 
 [6]
 Although the judge spoke of these factors as rendering the Russell 18 'unstable and peadily susceptible to an unusual list,' 248 F.Supp. at 241, the testimony shows that their respective effects would be somewhat different. The slight port list created by failure completely to compensate for the malplacement of the engine would not significantly affect the tug's tendency to right itself to that same point. On the other hand, the existence of 'free surface,' as a result of not filling the starboard with tank and of leaving fuel in the lazarette or, for that matter, of normal use of fuel, would create some instability in the usual sense
 
 
 [7]
 The testimony as to how much fuel had accumulated in the lazarette was in conflict. Evans, the tug's chief engineer, said the height was 11", a figure which the judge acceped, but estimated the quantity at 100 gallons. Ganly, a naval architect, calculated that, due to the Vshape of the lazarette, 11" would be only 37 gallons or .12 tons. He thought that this would have a negligible effect on the stability of the tug and that the effect of even 100 gallons, equivalent to a height of 20", would be small
 
 
 [8]
 Using the years 1957-59 as a base period, the purchasing power of the dollar has declined from $1.194 in 1950 to $.971 in 1960 and $.925 in 1964. Statistical Abstract of the United States 1965, p. 365