Carl W. PLANT, Jr., to his own use and to the use of the United States of America

v.

SIMMONS COMPANY, a Delaware corporation, and Donald Francis Klosterman, and Kathryn, Hutcheson Crawford.

William Joseph OXENDINE, an infant, by his mother and next friend, Willie Mae Oxendine; and Willie Mae Oxendine, to her own use and to the use of the United States of America

v.

SIMMONS COMPANY, a Delaware corporation, and Donald Francis Klosterman, and Kathryn Hutcheson Crawford.

Carolyn Ann CRAWFORD, surviving wife of Billy Wayne Crawford, deceased, individually and for the use of Tina Marie Crawford, surviving infant child of Billy Wayne Crawford, deceased, and Carolyn Ann Crawford and Eugene V. Chircus, co-administrators of the Estate of Billy Wayne Crawford, deceased, to their own use and to the use of the United States of America

v.

SIMMONS COMPANY, a Delaware corporation, and Donald Francis Klosterman and Kathryn Hutcheson Crawford.

Civ. Nos. 17326, 17373, 17374.

United States District Court,
D. Maryland.

Dec. 30, 1970.

Fred Ginsberg and Eugene V. Chircus, Baltimore, Md., for plaintiffs.

John H. Mudd and Semmes, Bowen & Semmes, Baltimore, Md., for defendants Simmons Co. and Donald Francis Klosterman.

Robert F. Freeze, Baltimore, Md., for defendant Kathryn Hutcheson Crawford.

THOMSEN, District Judge.

In these three cases—two for personal injuries and one for death—counsel for plaintiffs proposes to offer in evidence the testimony of Professor Carl F. Christ, of the Department of Economics of The Johns Hopkins University:

(a) as part of the proof of "the present value of the economic loss from the injury of a man under circumstances like Oxendine's";

(b) as part of the proof of "the present value of the economic loss from the injury of a man under circumstances like Plant's"; and

(c) as part of the proof of "the present value of the economic loss from the death of a man under circumstances like Crawford's".

Several questions are presented on which the parties desire preliminary rulings, so that they may adequately prepare for trial.

The questions include:

(1) Whether the economist will be allowed to testify with respect to expected lifetime earnings of the men before the accident?

(2) Whether, and if the answer is yes, how the present value of the estimated loss of future earnings should be calculated to reflect the probable future behavior of (a) interest rates, (b) inflation and (c) labor productivity, if those factors can be estimated with sufficient certainty to make such calculations admissible in evidence.

(3) What effect, if any, should be given to (a) income taxes on past earnings and on anticipated future earnings, and/or (b) the fact that the award of damages will not be subject to income taxes, although income from securities or other property in which any part of the award may be invested probably will be subject to income taxes?

(4) In the death case, (a) whether the 1969 amendment to Art. 67, § 4 of

the Maryland Code, changing the elements for which an allowance may be made, should be applied retroactively; and (b) whether the remarriage of the widow may be referred to and/or considered in the computation of damages?

■ Preliminarily, it should be stated that the testimony of an economist, like that of other experts, is admissible for certain purposes, and not ' for others. Before he may make certain assumptions, draw certain inferences or state his opinion on certain matters, there must be evidence in the record to support such assumptions, inferences or opinions. On the other hand, he may be allowed to provide certain information out of his expert knowledge.

### (1), (2)

Based upon U. S. Bureau of Labor Statistics data, as to which he is qualified to testify, Professor Christ believes that the real purchasing power of average earnings per man in the United States has increased by about 2% a year over the past 40 years—that is, the average money earnings per man have increased about 2% a year faster than the consumer price index; that this rate has been quite stable, and can be expected to continue at about 2% a year.

Based upon data from the U. S. Bureau of Labor Statistics and the Federal Reserve Board, he believes that interest rates on safe investments like bank savings deposits and certificates of deposit tend on the average to be about the same as the rate of increase in average money earnings per man—that is, these interest rates tend on the average to be about 2% higher than the rate of increase of the consumer price index; that this relationship is not very stable over short periods, but over periods of several years it can be expected to hold true on the average, with the difference between these interest rates and the rate of increase of the consumer price index remaining on the average between 1% and 3%.

In his opinion this means that future relationships, over periods of several years, among interest rates and the rates of increase of prices and earnings can be expected to be approximately as follows:

| When the rate of increase in the consumer price index is this: | Then the rate of increase in average money earnings per man will be approximately this: | And the average rate of interest on bank savings deposits and certificates of deposit will be approx. this (plus or minus 1%): |
|---|---|---|
| 0% a year | 2% a year | 2% a year |
| 1% a year | 3% a year | 3% a year |
| 2% a year | 4% a year | 4% a year |
| 3% a year | 5% a year | 5% a year |
| 4% a year | ·6% a year | 6% a year |

He believes that these considerations justify the following two premises, which he has used in calculating present values: labor productivity, and the real purchasing power of average earnings per man, will continue to increase at the rate of 2% a year; and that the annual rate of interest on bank savings deposits and certificates of deposit will continue to exceed the annual rate of increase in the price level by about 2%, not by more than 3% and not by less than 1%, over the long run.

Technical Paper 16, Present Value of Estimated Lifetime Earnings, by Herman P. Miller, Chief, Population Division, and Richard A. Hornseth, Systems Division, of the Bureau of Census (T.P. 16), published by the Department of Commerce in 1967, gives figures for the annual income, and the present value of expected lifetime earnings, for males, classified by age, race, education, and occupational group. The data are based on the 1960 census reports, which pertain to the year 1959. They take account of the mortality tables given in Vital Statistics of the U. S., 1964, Vol. II, Sec. 5, Life Tables. Professor Christ has updated the figures by use of the ratio of the 1968 value to the 1959 value of average weekly earnings in nonagricultural private employment, as reported by the U. S. Bureau of Labor Statistics in the Economic Report of the President for January, 1969, page 262, and proposes to use the Economic Report of the President, February, 1970, and other appropriate data to update them to the time of trial.

T.P. 16 divides men into various classes based upon:

(A) *Occupation*—(1) Professional, Technical and Kindred Workers, (2) Farmers and Farm Managers, (3) Managers, Officials and Proprietors, Excluding Farm, (4) Clerical and Kindred Workers, (5) Sales Workers, (6) Craftsmen, Foremen and Kindred Workers, (7) Operations and Kindred Workers, (8) Service Workers, including Private Household, (9) Farm Laborers and Foremen, (10) Laborers, excluding Farm and Mine.

(B) *Education Level*. Each of the ten classes, as well as the "total experienced labor force", is subdivided into (1) Elementary: 8 years; (2) High School: 4 years; (3) College: 4 years or more. Figures are also given for (4) overall Education Levels.

(C) *Race*. White and non-white. Figures are also given for the Total.

For each of these classes and subdivisions, the tables show the expected lifetime earnings, and present values thereof based upon various discount rates and various percentages of annual productivity increase.

Professor Christ proposes to use, in the case of each plaintiff, the figures for a white male high school graduate in technical and professional employment (which includes electrical and electronic technicians) of the appropriate age. He will make similar calculations based upon classification in the "total experienced labor force" with four years of high school, for use if the evidence does not justify the preferred classification.

To obtain the present value of expected disabled lifetime earnings for Oxendine, Professor Christ proposes to use the ratio of Oxendine's actual earnings in the period between his discharge from the armed services and the date as of which the calculation is made to the earnings (calculated as above) of a normal male high school graduate of his age employed for the same period in professional and technical work (and, alternatively, in the total experienced labor force). In his preliminary calculation, Professor Christ found this ratio to be 72%. He then multiplied this percentage of the present value of expected normal lifetime earnings. This procedure will be correct if Oxendine's actual future earnings continue to average 72% of the earnings of a comparable normal man. (Similar alternative calculations using the figures for the "total experienced labor force", will be made for use in the event the evidence does not justify placing Oxendine in the preferred classification).

He proposes that a similar procedure be used in the case of Plant.

Professor Christ notes that "the disability rating" for the respective men can be used as an alternative estimate of the amount by which lifetime earnings will be reduced. In his opinion it is less reliable than the procedure he proposes to use. Incidentally, in each case it yields a lower figure for the present value of expected disabled lifetime earnings, and hence a higher figure for the present value of economic loss than the procedure Professor Christ proposes to use.

In the death case (Crawford), Professor Christ proposes to use the same method of calculating Crawford's expected normal lifetime earnings. To estimate the fraction of Crawford's expected lifetime earnings needed to provide the consumer goods that he himself would have used (as distinct from his wife and child), he proposes to use the method proposed by Earl F. Cheit in his book, Injury and Recovery in the Course of Employment (John Wiley and Sons, 1961), as follows: First, compute the number of "minor dependency years", which is the total number of child-years under age 18 at the time of the father's death. This is 18.5 in Crawford's case, since his daughter was born about half a year after he died. Second, determine the work life expectancy at the time of death. For Crawford, who died at the age of 19.8 years, this is 42.8 years, according to the "Table of Working Life: Males, 1960" in the Monthly Labor Re-

view for July, 1963, page 822. (This Review is a publication of the U.S. Department of Labor.) Third, find the ratio of minor dependency years to work life expectancy. For Crawford, this is 18.5 divided by 42.8, which is 0.432. Fourth, look up this ratio in the table on page 81 of Cheit's book, to determine the ratio of the family head's consumption expenditures to total family income. His table is based on expenditure records of many families of different sizes and age composition. For Crawford, this fraction is 28.3%. That figure would be used to calculate the present value of expected lifetime consumer expenditures of Crawford, had he lived, to be subtracted from the present value of total expected normal lifetime earnings from the date of the accident to retirement, in order to determine the present value of the economic loss to plaintiffs.

■ Professor Christ may use the tables in T.P. 16, provided there is evidence legally sufficient to justify the class and subdivision thereof in which he places the respective plaintiffs or decedents. He may offer alternative computations based upon different classifications supported by the evidence.

He may be cross-examined at trial on other possible classifications, inter alia. If defendants' counsel intends to ask him to make calculations based upon other classifications, he should notify plaintiffs' counsel in advance, on a date to be agreed upon or fixed by the Court, so that trial time will not be lost while such calculations are made.

Defendants may, of course, offer calculations, if found by the Court to be based upon facts in evidence and/or other acceptable tables or expert knowledge, which take essential factors into account. The names and reports of any such experts should be furnished to the Court for study and possible advance rulings and to plaintiffs' counsel sufficiently in advance of trial to permit appropriate use of Rule 26, F.R.Civ.P.

It is noted with commendation that plaintiffs' counsel do not propose to offer testimony based on a report they obtained from another economist, based upon factors too speculative to be admissible in evidence.

### (3)

The past practice of this Court—not to include probable income taxes in estimating loss of future income in injury and death actions—is discussed in Jennings v. United States, 178 F.Supp. 516, 523–524 (D.Md.1959), rev'd on other grounds, 291 F.2d 880 (4 Cir. 1961), decision after remand aff'd 318 F.2d 718 (4 Cir. 1963).

In recent years the subject has been discussed in a number of opinions, with divergent conclusions,[1] and in a number of law review articles and notes, with various recommendations.[2]

■ This Court concludes that in the absence of controlling authority it should not depart from its established practice. Exceptional cases may arise in the future, where the rule adopted by the Second Circuit in McWeeney v. New York, N. H. & Hart. R. Co., 282 F.2d 34, 35–39 (1960), and clarified in later cases, e. g., Petition of Marina Mercante Nicaraguense, S. A., 364 F.2d 118, 125–126 (2

---

1. See Cox v. Northwest Airlines, Inc., 379 F.2d 893 (7 Cir. 1967); United States v. Sommers, 351 F.2d 354 (10 Cir. 1965); McWeeney v. New York, N.H. & Hart. R. Co., 282 F.2d 34 (2 Cir. 1960), cert. den. 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960); Petition of Marina Mercante Nicaraguense, S.A., 364 F.2d 118, 125–126 (2 Cir. 1966); O'Connor v. United States, 269 F.2d 578, 579 (2 Cir. 1959). See also Floyd v. Fruit Industries, 144 Conn. 659, 136 A.2d 918 (1957).

2. Note, Income Taxes and the Computation of Lost Future Earnings in Wrongful Death and Personal Injury Cases, 29 Md.L.Rev. 177; Lawless, Computation of Future Damages: A View from the Bench, 54 Georgetown L.J. 1131 (1966); Wright, Foreword to Symposium —Damages for Personal Injuries, 19 Ohio St.L.J. 155 (1958).

Cir. 1966), should be applied;[3] but this is not such a case.

The use of the tables in T.P. 16 weaken or remove one of the arguments against an adjustment for taxes, noted in both *Jennings* and *McWeeney*, but the other reasons remain and are sufficient in this case.

*McWeeney* held that it is proper to instruct the jury that if they find for the plaintiff they should not "add any sum of money to the amount of the verdict on account of federal or state income taxes, since the amount awarded to the plaintiff by your verdict is not taxable income to the plaintiff within the meaning of these tax laws". 282 F.2d at 39. It seems fair to add to such an instruction a corollary, that the income which the plaintiff or the plaintiff's decedent would have earned in the future would probably be subject to income taxes, but that the income from any securities or other property in which any part of the award may be invested will also probably be subject to income taxes, and the jury should therefore not consider the matter of income taxes in any way in reaching an award. A simpler way of handling the matter, which this Court believes will generally be preferable, is to instruct the jury not to consider income taxes in any way, either to reduce or increase the amount of an award. The Court will grant such an instruction, if requested by either side.

### (4)

Before an amendment to Art. 67, § 4 of the Maryland Code, which became effective on July 1, 1969, the damages recoverable for negligence causing death were limited to the pecuniary losses. See Jennings v. United States, supra,

178 F.Supp. at 530, 531, and cases cited therein.

The 1969 amendment provides as follows:

"§ 4. Action for wrongful death.

"(a) Every such action shall be for the benefit of the wife, husband, parent and child of the person whose death shall have been so caused or if there be no such person or persons entitled then any person related to the deceased by blood or marriage, who, as a matter of fact, was wholly dependent upon the person whose death shall have been so caused. 'Parent' shall include the mother of an illegitimate child whose death shall have been so caused; 'child' shall include an illegitimate child whenever the person whose death is so caused is the mother of such child; and in every such action the jury may give such damages as they may think proportioned to the injury resulting from such death to the parties respectively for whom and for whose benefit such action shall be brought, and the amount so recovered, after deducting the costs not recovered from the defendant, shall be divided amongst the above-mentioned parties, in such shares as the jury by their verdict shall find and direct; provided, that no more than one action shall lie for and in respect of the same subject matter of complaint; and that every such action shall be commenced within two years after the death of the deceased person.

"(b) In the case of the death of a spouse or a minor child, the damages awarded by a jury in such cases shall not be limited or restricted to the 'pecuniary loss' or 'pecuniary benefit'

---

3. That rule is that estimated future income taxes should not be deducted in "the great mass of litigation at the lower or middle reach of the income scale, where future income is fairly predictable, added exemptions or deductions drastically affect the tax and * * * the plaintiff is almost certain to be undercompensated for loss of earning power in any event",

282 F.2d at 39, 364 F.2d at 125; that "[t]here may be cases where failure to make some adjustment for the portion of a plaintiff's or decedent's earnings that would have been taken by income taxes would produce an improper result; but these are at the opposite end of the income spectrum". 282 F.2d at 38, 364 F.2d at 125.

rule, but may include damages for mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, parental care, filial care, attention, advice, counsel, training, guidance, or education where applicable."

(a) The question whether the amendment should be applied in cases where the injury occurred before July 1, 1969, but the trial is held after that date, has not been authoritatively determined. Some nisi prius courts in Maryland have applied it in such cases; some have held that it was not applicable. Some of the cases are now on appeal to the Court of Special Appeals; but there will probably be a further appeal to the Court of Appeals of Maryland. The present cases have been pending for a long time, for reasons for which plaintiffs are not responsible, and should not be postponed to await an appellate decision.

 Judge Harvey is the only judge of this court who has ruled on the point; he held it not applicable in such a case. Judge Watkins and I have considered the matter independently, in cases pending before each of us. We have had the benefit of briefs filed with the Court of Special Appeals. We are agreed that the amendment affects substantive rights as distinguished from procedural, and under applicable Maryland law should be given prospective application.[4] Unsatisfied Claim and Judgment Fund Board v. Bowman, 249 Md. 705, 241 A.2d 714 (1968); State Farm Mutual Automobile Insurance Co. v. Hearn, Adm'x, 242 Md. 575, 582, 219 A.2d 820 (1966). See also Smith v. Mercer, 276 N.C. 329, 172 S.E.2d 489 (1970); Regan v. Davis, 290 Pa. 167, 138 A. 751 (1927); Theodosis v. Keeshin Motor Express Co., Inc., 341 Ill.App. 8, 92 N.E.2d 794 (1950); Field v. Witt Tire Co., 200 F.2d 74 (2 Cir. 1952); Conn v. Young, 267 F.2d 725 (2 Cir. 1959); Herrick v. Sayler, 245 F.2d 171 (7 Cir. 1957); Jennings v. United States, 178 F.Supp. 516 (D.Md.1959);

State to Use of Maines v. A/S Nye Kristianborg, 84 F.Supp. 775 (D.Md. 1949).

 (b) There remains the often-discussed but never authoritatively answered question whether the remarriage of a surviving widow should be made known to or kept secret from the jury, under the law as it stood before July 1, 1969. Our experience persuades us that in most cases in the state courts and in this court, the fact of remarriage has not been disclosed. The circumstances of this case make that the appropriate ruling here.

 Since the amended statute permits recovery for mental anguish, emotional pain and suffering, loss of society, companionship, comfort and protection, it seems clear that in cases where the new statute is applicable, the jury should know whether the widow or widower has remarried.

4. Since this opinon was delivered to counsel, but before it was filed with the Clerk, the Court of Special Appeals has reached the same conclusion. Whittel v. Baker et al., 10 Md.App. 531, 272 A.2d 57 (1970).