**Ronald J. NEMMERS and Sarah L. Nemmers, as parents and next friends of Eric P. Nemmers, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 82–1257.

United States District Court, C.D. Illinois, Peoria Division.

June 27, 1985.

Edward R. Durree, Strodel, Kingery & Durree, Peoria, Ill., for plaintiffs.

Mark D. Stuaan, Asst. U.S. Atty., Peoria, Ill., for defendant.

## MEMORANDUM OPINION

MIHM, District Judge.

The Court has determined that this action, filed by Ronald and Sarah Nemmers as parents and next friends of Eric Nemmers, seeking damages for alleged medical malpractice, is governed by the substantive law of the State of Maryland. The action is brought under the Federal Tort Claim Act which imposes a statutory time limit of two years after the accrual of the claim. 28 U.S.C. § 2401(b). Under Maryland law, the burden of proving, by a preponderance of the evidence, that the Defendant's negligence was one direct and proximate cause of the injury suffered rests with the Plaintiffs.

## FACTUAL BACKGROUND

Eric Nemmers was born on July 23, 1973 at the Hospital of the Naval Air Station, Patuxent River, Maryland. Sarah Nemmers learned of her pregnancy on November 13, 1972 as a result of a pregnancy test performed in Madison, Wisconsin. Her husband, Ronald, had enlisted in the Navy and been sent to Orlando, Florida for boot camp. She, in the meantime, returned to Dubuque, Iowa, where she saw an obstetrician on December 22, 1972. He confirmed that she was pregnant and calculated an estimated due date of June 29, 1973, based on the first day of her last menstrual period. From February of 1973, when she moved with her husband to the Naval Air Station in Pensacola, Florida, to and through the time of her delivery, she sought and maintained regular obstetrical care from United States naval physicians. She was seen five times by physicians in Pensacola and, when Ronald Nemmers was transferred to Maryland, she began routine visits at the Naval Air Station, Patuxent River, Maryland.

Sarah Nemmers was 21 days beyond her estimated due date on July 20, 1973 when she was taken to the hospital with irregular pains and very light contractions. At that time, Dr. Hooper, one of her three treating physicians at Patuxent River, prescribed a suppository and sent her home, telling her to return when the pains were regular and five minutes apart. After experiencing more intense pain, beginning in the wee hours of July 21, she contacted the hospital at approximately 10:00 a.m. and was again advised (this time by an obstetrical nurse) that she should not come in until the pains were five minutes apart. They continued with increasing intensity, causing her to again telephone the hospital at 7:00 p.m. An obstetrical nurse reiterated the instruction that she was not to come or call again until the pains were regular and five minutes apart. During the late night hours of July 21, Mrs. Nemmers, on three occasions, discharged a dark yellow, mucousy fluid which disclosed no blood when she inspected it. By the evening of July 22, pain and the insistence of her visiting inlaws compelled Sarah to return to the hospital, even though the pains were still not five minutes apart. She was admitted, in labor, on July 22 at 9:50 p.m. At that time, an examination by Dr. Stephen Hooper revealed that the cervix was 95% effaced, dilation was at four centimeters, and the fetal heart rate was 132.

In the early morning hours of July 23, the attendant obstetrical nurse had difficulty finding the baby's heartbeat. Dr. Hooper ordered the use of a Doptone fetal heart tone amplifier, and subsequent monitoring over the next three and one-half hours showed an irregular beat, varying between 120 and 140. In the operating room this range dropped to 100/120. On two occasions prior to delivery, the heart rate declined to 80. Eric Nemmers was delivered by Caesarean section at 4:22 a.m. on July 23.

Dr. Hooper's "clinical record" discloses his belief that the baby was "probably postmature." This opinion was echoed by Drs. Burmeister, Rosenthal, and Socol, all experts who testified at trial.

Although Eric appeared at birth to be normal (his Apgar scores were five at one minute and nine at five minutes) and both parents were told that they had a healthy baby boy, Mrs. Nemmers became concerned when Eric was about 12 months old because she felt he was not even ready to begin walking. When she expressed her concerns to the pediatrician at his one year check-up, she was told not to worry. At that time the Nemmers were taking Eric to Bethesda for treatment of his crossed eyes and the pediatrician suggested that the eye problems might be a partial cause of his not walking. That pediatrician, Dr. Lutehart, never did motor testing of Eric. Such testing was done when Eric was 18 months old, resulting in a preliminary diagnosis of either cerebral palsy or muscular dystrophy.

The final diagnosis of cerebral palsy was made by a neurologist, Dr. Loeschner, who came from Bethesda. He became Eric's treating physician and, when questioned by Mr. and Mrs. Nemmers about the cause of Eric's illness, he assured them that "these things just happen" and that "it's an act of God and only God knows why." At this time, no one ever indicated to the Nemmers that there might be any connection between the circumstances of the delivery and Eric's cerebral palsy.

Following Ronald Nemmers' discharge from the Navy in 1977, the Nemmers moved to Minnesota and, in 1977, took Eric to Dr. Steven Copps, a pediatrician at the Gunderson Clinic in LaCrosse, Wisconsin for evaluation and treatment. In his evaluative report of May, 1977, Dr. Copps indicated several possible causes of Eric's condition, suggesting that a bout of influenza in the first trimester of the pregnancy was the most likely cause. Dr. Copps, in his report, did allude to something which he called the "trauma of birth."

The Nemmers moved to Peoria and Eric began attending the Robert Jamieson school. In October of 1979, the Nemmers learned that Eric was not just "developmentally delayed," or mildly retarded but, rather, that he suffered from severe retardation.

On August 26, 1981, Mrs. Nemmers read an article which appeared in the Peoria *Journal Star*. The article recounted a number of similarities between the little girl who was its subject and Eric, described a Caesarean section being delayed with resulting reduction of oxygen, and reported a large out of court settlement. Then on the next day, August 27, she and her husband read another article in the same newspaper. This time the report was of a case which was in no way similar to Eric's, but it did indicate that the aggrieved parties were suing the Government. The Nemmers submit that it was the juxtaposition of these two articles which first alerted them to the possibility that there was a connection between Mrs. Nemmers' difficult delivery and Eric's subsequent problems. They promptly sought legal counsel and initiated this suit against the federal government.

## FINDINGS OF FACT

### Statute of Limitations

The Nemmers sought information about the cause of Eric's cerebral palsy from Dr. Pretlow, a pediatrician at Patuxent River, and Dr. Loeschner, the neurologist from Bethesda Naval Hospital. They were assured that the causes were unknown and that it was just one of those things and only God knows the cause. Neither doctor at any time suggested a connection between the circumstances of delivery and Eric's cerebral palsy, nor had any such causal relationship been suggested by any Navy personnel at the time of Mr. Nemmers' discharge. Although the Nemmers had access to the medical records of both Mrs. Nemmers and Eric, they were effectively diverted from the import of those records by statements made to them by the doctors.

The Court is very concerned by the report of Dr. Copps and has studied it carefully. His evaluative letter/report to the Nemmers delineated a number of possible causes, but concluded that the actual cause

was influenza suffered by Mrs. Nemmers in the first trimester. There was in the letter a reference to "the trauma of the birth" and "fetal distress," but again, attention was diverted by his asserted belief that influenza was the cause. Clearly, the Nemmers could have challenged the statements with respect to the nature of the disease, but there was no reason to have done so. Their goal was the rehabilitation of their son, not the determination of the cause or the assessment of blame. The Court does not believe that it can reasonably be said that, at that time, they knew or should have known that fetal distress or Mrs. Nemmers' difficult labor and delivery could have caused Eric's condition. The Court accepts the testimony of Eric's parents that they believed that "trauma of birth" meant that Eric "had a hard time being born," not that he had developed an injury occasioned by lack of oxygen because of delay in the baby's delivery.

It is plain from the testimony of both Mr. and Mrs. Nemmers that they did act quickly after the appearance of the two newspaper articles which alerted them to the possible connection between Mrs. Nemmers' difficult delivery and Eric's cerebral palsy and extreme retardation.

### Standard of Care

Post-maturity is a red flag which signals, for the obstetrician, an increased vulnerability of the fetus to injury during labor and delivery. This increased risk is caused by a diminution of the ability of the placenta to provide oxygen and nourishment to the fetus and a probable decrease in the amniotic fluid, which normally acts as a buffer between the fetus and the muscle walls during intense labor and delivery. There are certain protective procedures which are triggered once the obstetrician is on notice that the patient might be post-mature. The experts presented by Plaintiffs were uniform in their assertion that, in 1973, an indication of post-maturity required the reasonably competent obstetrician to employ certain diagnostic techniques for monitoring the continued well-being of the fetus and the placenta. The

testimony of Plaintiffs' experts, reinforced by the Fourteenth Edition of *Williams Obstetrics,* 1971, which was the leading obstetrical authority in 1973, established the need for periodic measurements of the estriol in the mother's urine and periodic amniocentesis to test for the presence of meconium in the amniotic fluid or for a drastic reduction in the fluid itself.

Defendant's expert, Dr. Michael Socol, was not in practice in 1973; he was a medical student. The thrust of his testimony was the establishment of what was *not* the standard of care in 1973, but, despite specific questions from the Court, he never indicated what the standard of care at that time was.

The value of estriol testing is questioned today, but it is not clear, even at this time, whether it is totally without merit. More recent technological advances have proven to be more effective and, consequently, have preempted its use. But, Plaintiffs' expert established that estriol testing and amniocentesis were elements of the standard of care in 1973 and, in the presence of suspected post-maturity, should have been done. The Court is persuaded, by a preponderance of the evidence, that estriol testing and amniocentesis were integral elements of the standard of care in the presence of possible post-maturity in 1973.

### Post-Maturity

For purposes of the issues in this case, the Court here finds that Eric Nemmers was post-mature at the time of his birth. The record discloses some dispute about the accuracy of the estimated due date of June 28, 1973. However, none of Mrs. Nemmers' treating physicians apparently doubted its accuracy enough to change that estimate. There is, of course, no way that a judge, who is not a doctor, can make a definitive finding of the correctness of the due date at any time—certainly not 12 years after the fact.

Nevertheless, Dr. Hooper reported, "at the time of delivery, there was virtually no amniotic fluid present. There was a thick, yellow meconium staining of the baby." He then concluded "by color of meconium

+ oilgohydramnious probably post-mature." Moreover, experts at trial, Dr. Burmeister, Dr. Rosenthal, and Defendant's expert, Dr. Socol, all agreed that Eric was post-mature. The Court accepts that the weight of the medical testimony establishes that Eric was, in fact, post-mature.

*Deviations From Standard of Care*

The Court, however, does not feel that actual post-maturity is the real issue. The critical issue is whether the doctors should have been on notice that the fetus *might* be post-mature.

The Court finds that a clinical suspicion of post-maturity was mandated by the simple fact that Sarah Nemmers' estimated due date was June 28 and she had passed the 42nd week of her pregnancy by July 14. As indicated earlier, whatever suspicions the obstetricians may have entertained about possible inaccuracy of the estimated due date were not sufficiently strong to lead them to change it. Therefore, the possibility of post-maturity, established by the calendar and by observed clinical indications of a loss of amniotic fluid, should have triggered periodic estriol testing and ammiocentesis, pursuant to the contemporary standard of care. These, however, were not done.

In addition, despite their awareness of the increased risk occasioned by the indicated post-maturity, Mrs. Nemmers' obstetricians did not monitor her closely. On the contrary, when she reported contractions on July 20, Dr. Hooper gave her a suppository to stimulate uterine activity and sent her home. Her telephone calls to the hospital generated only the standard response that she should wait until the contractions were five minutes apart and regular. Her doctors were in no position to, and consequently did not, observe the thick yellow discharges which she experienced.

The Court finds that, in the presence of several indicators of post-maturity and potential injury to the fetus resulting therefrom, Mrs. Nemmers' obstetricians deviated from the standard of care.

Furthermore, given the extensive meconium staining of the infant at birth and the absence of amniotic fluid, the Court believes it is probable, perhaps likely, that estriol testing and amniocentesis would have demonstrated a degree of fetal distress on July 20 which would have indicated the advisability of an immediate Caesarean section. This necessarily results in a finding that Mrs. Nemmers' labor continued for three days after delivery should have been completed for the safety of the infant.

Dr. Hooper indicated his belief that estriol testing would have been ineffective in this case because Patuxent River Hospital had no facilities for it, his specimens would have had to be sent to Bethesda Naval Hospital, and he would not have received timely results. The Court believes that, because such tests were part of the standard of care, any delivery unit would, of necessity, have had to have equipment and space for such testing and evaluation. A failure to provide adequate medical facilities is a deviation, on the part of the United States, from the contemporaneous standard of care.

*Causation*

Defendant, United States, has suggested, as possible causes of Eric's injuries, influenza sustained by Mrs. Nemmers in the first trimester of her pregnancy or the normal trauma of birth. If the Court chose to speculate, the arguments presented by Defendant could be persuasive. But, the Court is duty bound to decide the issues based on the record in this case. The preponderance of evidence is that this was a post-mature pregnancy, that tests should have been done that were not done, that insufficient amniotic fluid was present, that there was fetal distress to the extent that the fetus became meconium stained. The preponderance of the expert medical evidence presented indicates that a Caesarean section should have been performed no later than July 20.

Defendant's expert, Dr. Socol, did not substantially address this issue. Nor did Defendant tender other substantial testi-

mony with respect to causation. The Court is aware of the fact that the burden of proof rests on the Plaintiff, not the Defendant; but where Plaintiff has presented adequate evidence of causation and expert testimony which is essentially unrefuted, the Court finds it difficult not to accept Plaintiffs' experts' assessment of proximate cause. Therefore, the Court finds that the record of the Plaintiffs creates, by preponderance of the evidence, a showing of proximate causation which is basically unrefuted.

This is a medical malpractice case. In the context of this action, as in any other, the probabilities and justifiable inferences are primarily established through expert testimony. In this case, the medical experts have convinced the Court of the correctness of their opinion that Eric's cerebral palsy, severe mental retardation, and attendant physical infirmities were caused by hypoxic injuries resulting from insufficient oxygen, nourishment, and amniotic cushioning during labor and delivery.

## CONCLUSIONS OF LAW

### Statute of Limitations

■ The Court is of the opinion that this case represents a classic example of why statutes of limitations exist. The incident complained of took place 12 years ago and the Defendant doctors have no independent memory of any of the critical events. This, theoretically, could be the case even if the incident had happened only a year ago, but clearly the duration of the interval has considerable impact on the ability to defend one's self effectively against recent allegations of past wrongdoing. Such delay creates a distinct disadvantage, and the Court sincerely sympathizes with Defendant's difficulty. However, the test for determining when the statute of limitations begins to run is focused on Plaintiffs and on that time when *they* reasonably knew or should have known of the existence of a cause of action. The Court believes, without repeating the sequence of events as set out in the findings of fact, that a careful consideration of the totality of the circumstances

compels a finding that the Nemmers first realized there was a possible connection between Eric's cerebral palsy and the circumstances attendant his delivery on August 26, 1981. The Court is convinced that, by the time the Nemmers received the letter from Dr. Copps, they had moved beyond the stage of seeking causes and assessing blame and were primarily concerned with effecting whatever improvements they could in Eric's condition and preparing him to live a life as close to normal as possible. Therefore, their attitude, coupled with Dr. Copps' diversion of their attention to the alleged influenza and its possible impact, as well as their understandable failure to understand the significance of the term "trauma of birth," rendered the substance of Dr. Copps' report insufficient to create the type of notice which would trigger the running of the statute of limitations.

### Deviations from the Standard of Care

■ As indicated earlier, the Court has found that the preponderance of the evidence in this case has established that Defendant, through its physicians, nurses, and medical facility, failed to provide Sarah Nemmers with that reasonably competent obstetrical care which was required, in the circumstances, by the standard of care in 1973. In addition, the Plaintiffs have established, by a preponderance of the evidence, that if Defendant had acted in accord with the contemporary standard of care, the findings resulting from the requisite testing would have advised the Defendant doctors of the urgency of performing a timely Caesarean section. The Court, therefore, finds that the failure to deliver Eric Nemmers by Caesarean section on July 20, 1973 constituted negligence.

### Proximate Causation

The Court has already in the findings of fact detailed with care its findings relating to the proximate cause of Eric's injuries and disabilities. The Court now holds that it has been established, by a preponderance of the evidence, that Defendant's negligent

failure to adhere to the existing standard of care was the cause of Eric Nemmers' cerebral palsy, severe retardation, and physical disabilities attendant thereto.

*Damages*

■ At trial, the wages lost to Eric Nemmers because of his physical and mental disabilities were shown and discounted to present cash value by Plaintiffs' expert, Dr. Edward Sattler, an economist from Bradley University. Dr. Sattler made the following assumptions about Eric Nemmers:

* that he had a normal life expectancy of 59 years from the date of trial;
* that he had a normal work life of 38 years;
* that he would begin to work in 1991 as a 19-year-old high school graduate;
* that he would command a starting salary of $13,600 and could expect a 2.2% annual salary increase.

He further assumed a "real interest" or actual discount rate of 4% based on a long term annual interest rate of 11.5% offset by a long term inflation rate of 7.5%.

Based on these assumptions, Dr. Sattler projected a present cash value of Eric Nemmers' lost wages of $661,813.15. Plaintiffs proposed a modification of that projection to reflect tax considerations which would result in an increased amount of $900,683.37.

■ The Court considers this proposal in light of the law of Maryland which applies to both liability and damages under the Federal Tort Claims Act. The rule in Maryland on this issue is that "income taxes are not to be considered in any way, either to reduce or increase the award."[1] *Cincotta v. United States,* 362 F.Supp. 386, 408 (D.C.Md.1973). See also *Plant v. Simmons, Co.,* 321 F.Supp. 735, 739–40 (D.C.Md.1970) and *Jennings v. United States,* 178 F.Supp. 516, 532 (D.C.Md.1959),

rev'd on other grounds, 291 F.2d 880 (4th Cir.1961), decision after remand affirmed 318 F.2d 718 (4th Cir.1963). This would appear to preclude both reduction of the award by the amount of income taxes which would have been payable by Eric Nemmers as well as the increase sought by Plaintiffs to offset taxes on possible potential investment income.

The Court notes that jurors are enjoined from speculation in the award of compensatory damages. That injunction is no less appropriate for the judge ruling from the bench. This Court believes it would be improperly speculative to award an offset for tax liability which may never materialize. This position finds emphatic reinforcement in *Flannery for Flannery v. United States,* 718 F.2d 108 (4th Cir.1983) in which the Court held:

"The plaintiff contends that if an adjustment is made for income taxes upon estimated future earnings, an adjustment should be made for the income taxes payable on income on invested funds after the judgment is paid. We reject the contention, for it is unknown how the fiduciary who will handle the funds will invest them. It could invest them in whole or in part in tax exempt securities. We find no basis for an adjustment for a tax liability which is avoidable and may never be incurred." 718 F.2d at 112.

Therefore, the proper award is $661,813.15 without any modification to reflect tax considerations.

The Court now turns to the task of assessing damages to provide for Eric Nemmers' future care and maintenance. Plaintiffs' expert, Dr. Terry V. Carle, a specialist in physical medicine and rehabilitation, recommended a surrogate family approach to be used in providing such care. In addition to best meeting Eric's needs, in Dr. Carle's opinion, such a program has the

---

[1] It should be noted that the position of the Maryland courts does not preclude application of the exception noted by the Second Circuit Court of Appeals in *McWeeney v. New York, N.H. & H.R.R.,* 282 F.2d 34, 35–59 (2nd Cir. 1960). See *Cincotta v. United States,* supra at

408 and *Plant v. Simmons,* supra, at 739–40. This exception, which permits deduction of income tax on future wages when the plaintiff or plaintiff's decedent has "great earning power," is not applicable, in the Court's opinion, to this case.

advantages of an annual cost which is substantially less than that incurred for the more traditional alternatives of resident schools, ranches, farms and other live-in facilities. The Court accepts that recommendation and adopts the surrogate program approach.

Dr. Carle projected an estimated annual cost of $57,100. This figure includes:

| | |
|---|---|
| $36,000 | Two full-time, live-in health care providers who would be surrogates for his parents. |
| 3,600 | Their food costs. |
| 10,000 | A manager, in the nature of a Guardian ad litem, to maintain the efficient operation of the program. |
| 4,500 | Annual vehicle expense. |
| 2,500 | Annual residence upkeep and taxes. |
| 500 | Annual health care costs (does not include routine health care). |
| $57,100 | |

The Court believes that, inasmuch as annual vehicle and household maintenance normally come from income, there would be, in effect, a double award if these items were to be included within the surrogate program costs. Accordingly, the recommended figure will be reduced by $7,000 to a total of $50,100. For basically the same reason, the Court declines to factor in the tax considerations.

The total amount which should be needed to care for and maintain the health of Eric Nemmers for the balance of his life is $50,100 for 59 years or $2,955,900.

Plaintiffs have sought to include in the award to Eric Nemmers the reasonable cost of a house. The Court declines to do this. As with the vehicle and household maintenance above, living facilities themselves are generally purchased or leased from employment income. There appears to be no adequate reason to depart from this practice here. Through this final order, the Court intends to provide for Eric's reasonable needs without generating a windfall for his family. If the parties had been amenable to a reversionary trust, the Court would have been less conservative in estimating the base value of Eric's future needs. But Ronald and Sarah Nemmers were not Plaintiffs in their own rights nor have they demonstrated compensable injury caused them by Defendant's negligence. The Court is not prepared, therefore, to make them an award except to the extent they are benefitted by relief from the financial burden of caring for their son in the future.

Plaintiffs have submitted alternative computations. One separates the salaries for surrogate personnel and applies a 2.2% annual real salary growth factor while maintaining the balance of the annual award at a fixed figure. This would result in an award of $1,804,989.75. The Court has chosen the second formulation. Using the same formula as above for reducing this award to present cash value and electing not to factor in the 2.2% annual real salary growth for the surrogate personnel, the Court hereby awards Eric Nemmers funds for his future care and maintenance in the amount of $1,173,729.15.

The Court declines to award compensation for "quality of life" considerations.

Judgment is hereby entered for the benefit of Eric Nemmers in the amount of:

| | |
|---|---|
| $ 661,813.15 | Present cash value of lost wages. |
| 1,173,729.15 | Present cash value of future care costs. |
| $1,835,542.30 | |